IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAI'I

| | |
|---|---|
| JOSHUA KNEPPER and LESLIE LUM-KING, | Case No. 22-cv-00556-DKW-WRP |
| Plaintiffs, | |
| vs. | **ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |
| MICHAEL BURGER, *et al.*, | |
| Defendants. | |

## <u>INTRODUCTION</u>

Plaintiffs Joshua Knepper and Leslie Lum-King assert constitutional and statutory claims under federal and state law arising out of (1) their interaction with City & County of Honolulu (City) police officers on April 7, 2022, and (2) the conduct of one of the officers after the initiation of this case. Defendants Michael Burger, Allen-John Vergara, Frederick Apo, Leonardo Juarez (collectively, the Officer Defendants), and the City (together, with the Officer Defendants, Defendants) move for summary judgment, which Plaintiffs oppose.

Upon review of the parties' briefing, evidentiary submissions, and relevant case law, in almost all respects, summary judgment is not warranted. Specifically, upon review of the parties' evidentiary submissions, there is a clear and material divide between their versions of events on April 7, 2022. Moreover, when said

evidence is construed in the light most favorable to Plaintiffs, as it must at this stage in the litigation, there is simply no basis for the Court to find in favor of Defendants on the vast majority of the claims asserted against the Officer Defendants.   However, because the evidentiary divide is immaterial to certain of Plaintiffs' claims under State law and *Monell*, summary judgment is warranted as to the same.   Therefore, for the reasons more fully discussed and explained below, the motion for summary judgment, Dkt. No. 105, is GRANTED IN PART and DENIED IN PART.

## RELEVANT PROCEDURAL BACKGROUND

On December 30, 2022, Plaintiffs initiated this action against Defendants. Dkt. No. 1.   On May 25, 2023, Plaintiffs filed a First Amended Complaint (FAC) against Defendants, raising five claims: (1) First Amendment violations, (2) Fourth Amendment violations, (3) violations of 42 U.S.C. Section 1983 against the City under *Monell v. Dep't of Soc. Services of the City of New York*, 436 U.S. 658 (1978), (4) negligence, and (5) battery, all arising out of an incident on April 7, 2022.   Dkt. No. 35.   On July 28, 2023, the Court granted in part and denied in part the City's motion, dismissing Claim Three (*Monell*) to the extent it relied upon theories of ratification or a failure to train and Claim Four (negligence) to the extent it relied upon theories of negligent training, supervision, and retention.

Dkt. No. 54.   The Court denied the motion in all other respects and permitted

Plaintiffs leave to amend by August 18, 2023, which they did not do.

Nonetheless, in December 2023, Plaintiffs moved to file a Second Amended

Complaint (SAC), arguing that events occurring in the "past few months" had

given rise to additional claims.   Dkt. No. 71 at 2.   Over Defendants' opposition,

Dkt. No. 77, Plaintiffs were granted leave to amend, Dkt. No. 87, and, on February

29, 2024, filed the SAC, Dkt. No. 88.   In addition to the claims alleged in and not

dismissed from the FAC, Knepper alleged the following three claims against

Burger: (6) violation of the First Amendment right to redress grievances;

(7) violation of due process under the Fourteenth Amendment; and (8) malicious

prosecution under the Fourth Amendment.   On May 17, 2024, Defendants sought

dismissal of Claims Six and Seven.   Dkt. No. 95.   On June 25, 2024, the Court

granted Defendants' motion, but with leave to amend.   Dkt. No. 99.

On July 9, 2024, Plaintiffs filed a Third Amended Complaint (TAC), Dkt.

No. 103, the operative pleading in this case.   Therein, Plaintiffs alleged seven

claims.   Claims One through Five, surviving from the FAC, allege federal and

state law claims arising out of the incident on April 7, 2022.   Claims Six and

Seven, brought solely by Knepper against Burger, arise out of Burger's alleged

actions following the initiation of this lawsuit and are brought under the First and Fourth Amendments for retaliation and malicious prosecution, respectively.

On December 13, 2024, Defendants filed the pending motion for summary judgment.   Dkt. No. 105.   Defendants also filed a concise statement of facts in support of the motion (DCSF).   Dkt. No. 106.   Plaintiffs oppose the motion, Dkt. No. 111, and have filed a concise statement of facts in support of their opposition (PCSF), Dkt. No. 112.   Defendants have filed a reply.   Dkt. No. 115.   On February 7, 2025, the Court held a hearing on the motion for summary judgment, with counsel present for both sides.   Dkt. No. 119.   This Order now follows.

## STANDARD OF REVIEW

Pursuant to Federal Rule of Civil Procedure 56(a), a party is entitled to summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."   The moving party is entitled to judgment as a matter of law when the non-moving party fails to make a sufficient showing on an essential element of a claim in the case on which the non-moving party has the burden of proof.   *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).   In contrast, when the moving party bears the burden of proof, "it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted…."   *Houghton v. South*, 965 F.2d

4

1532, 1536 (9th Cir. 1992).   This means that the movant "must establish beyond

controversy every essential element" of its claim.   *See S. Cal. Gas Co. v. City of*

*Santa Ana*, 336 F.3d 885, 888 (9th Cir. 2003) (quotation omitted).   In assessing a

motion for summary judgment, all facts are construed in the light most favorable to

the non-moving party--here, the Plaintiffs.   *Genzler v. Longanbach*, 410 F.3d 630,

636 (9th Cir. 2005).

## FACTUAL BACKGROUND[1]

In the early morning on April 7, 2022, Knepper and Lum-King went to

Sherwood's beach park in Waimanalo in order for Lum-King to "freshen up."

Depo. of Leslie Lum-King at 33:23-34:19, Dkt. No. 112-10.   After finishing,

Lum-King returned to a vehicle driven by Knepper.   *Id.* at 33:11-19, 38:12-15, 23-

25.   Knepper then drove from a parking space outside of the restroom to a spot

away from the restroom "towards the middle of the park" where he parked and put

---

[1]Before embarking on the factual background, the Court addresses the following recurrent issue.
Pursuant to Local Rule 56.1(e), a party opposing summary judgment must file a single concise
statement of facts addressing each of the factual statements made by the moving party.   The
non-movant may also assert, in a separate section of the single statement, additional facts
believed to be relevant.   Here, Plaintiffs did both—first, opposing Defendants' factual
statements, *see* Dkt. No. 112 at ¶¶ 1-41, and asserting their own additional facts, *see id.* at ¶¶ 42-
118.   When this occurs, Local Rule 56.1(e) provides that, in filing its reply, the movant shall
respond to each of the additional facts.   Here, Defendants did not do so.   *Generally* Dkt. No.
115.   Therefore, in addition to the need to construe the evidence in the light most favorable to
Plaintiffs, to the extent supported by the cited evidence, the Court construes Plaintiffs' additional
facts, *i.e.*, Dkt. No. 112 at ¶¶ 42-118, as unopposed for purposes of summary judgment.

shades up to cover the windows.  *Id*. at 39:8-19.  More specifically, in Lum-King's estimation, the car was parked in "the unofficial middle ground" of the park "visible from everywhere…."  *Id*. at 40:11-25.  While parked at this location, Lum-King and Knepper "fooled around" for about an hour.  *Id*. at 41:17-42:1.

On that same day, April 7, 2022, Honolulu Police Department (HPD) Officers Michael Burger, Allen-John Vergara, and Leonardo Juarez were on "special duty" assisting with traffic control at a construction site in Waimanalo along Kalaniana'ole Highway ("the Highway").  Decl. of Michael Burger at ¶¶ 2-3, Dkt. No. 106-2; Decl. of Allen-John Vergara at ¶¶ 2-3, Dkt. No. 106-3; Decl. of Leonardo Juarez at ¶¶ 2-3, Dkt. No. 106-5.  Due to the construction, only one lane of the Highway was available for vehicular traffic, requiring Burger, Vergara, and Juarez to coordinate the alternating use of a single lane for both directions of traffic.  DCSF at ¶ 3; PCSF at ¶ 3.

At approximately 11:20 a.m., Burger was flagged down by an unknown male on a moped who related that someone, a different unknown male, had "just broken into a car" at Sherwood's and that the unknown male suspect was with others "in a gold colored Toyota 4-Runner…."  Burger Decl. at ¶ 9; 4/7/22 HPD Incident Report at 1, Dkt. No. 112-4.  Burger relayed the reported crime and the possible involvement of a gold 4-Runner to HPD Communications, and HPD

Officer Frederick Apo was dispatched to investigate.   *Id*.; Burger Decl. at ¶ 10;

Decl. of Frederick Apo at ¶¶ 2-4, Dkt. No. 106-4.

Soon after arriving at Sherwood's, Apo's attention was drawn to a dark-

colored Jaguar sports-utility vehicle.   Apo Decl. at ¶ 5.   According to Apo, the

Jaguar was attention-worthy because it was "running but had shaded window

covers blocking the front windshield[,]" "parked in an overflow lot even though

[the] main parking lot was nearly empty[,]" and "parked near a bush line in the

corner of the overflow lot…."   *Id*.[2]   Apo conducted a license plate check of the

Jaguar, learning that the registration and safety check were expired and that the

vehicle had been involved in an incident where Knepper had been reported in

possession of a firearm.   *Id*. at ¶ 6.   Prior to investigating the vehicle further, Apo

was stopped by witnesses of the car break-in and, while speaking with the

witnesses, the Jaguar departed Sherwood's.   *Id*. at ¶¶ 7-8.

After leaving Sherwood's, Knepper and Lum-King turned onto the

Highway.   Lum-King Depo. at 64:2-4.   Once on the Highway, Knepper drove for

about 15-20 minutes in traffic slowed and/or stopped by the construction work.

*Id*. at 64:5-22.   Meanwhile, Apo called Burger to relay the details of his

---

[2]Apo further stated that the Jaguar "would not have been easily seen by anyone," but, as set forth
earlier, how easily or not the vehicle could be seen is disputed.

investigation and suggest looking out for a vehicle matching the Jaguar.   Apo
Decl. at ¶ 10.   Within a few minutes, the Jaguar was seen near Waimanalo
Elementary School by Burger, Vergara, and/or Juarez.   DCSF at ¶ 11; PCSF at ¶
11.   It is undisputed that Burger then stopped the Jaguar.   *See* DCSF at ¶ 12;
PCSF at ¶ 12.   However, many aspects of the ensuing encounter are disputed.   In
the light most favorable to Plaintiffs, the evidence shows the following.

Burger activated the emergency lights on his vehicle, approached the Jaguar,
and, initially, told Knepper and Lum-King to stay where they were.   Burger Decl.
at ¶ 14; Lum-King Depo. at 69:10-12, 70:11-14.   Knepper responded by asking
Burger why he was being stopped, to which Burger did not reply.   Lum-King
Depo. at 69:12-14, 70:15-19.   Burger then told Knepper to turn around and pull
into the elementary school parking lot, roughly 50 feet away.   *Id*. at 69:14-17.
Knepper responded by yelling "fuck you, I don't have to do shit."   Burger Decl. at
15.   Knepper then asked again why he was being pulled over, to which Burger
responded he was "going to tow" Knepper's vehicle, and he could "make up any
reason" for doing so.   Depo. of Joshua Knepper at 74:1-5, 85:4-14, Dkt. No. 112-
11.   Lum-King agrees that Knepper "repeatedly" asked Burger why he was being
stopped, never receiving a response.   Lum-King Depo. at 74:19-75:4, 75:25-76:4.

Burger then exited his vehicle and approached the Jaguar on foot.    Burger

Decl. at ¶ 17.    As Burger approached, Knepper exited the Jaguar with the engine

running, and the two interacted near the middle of the Highway.    *Id*. at ¶ 18;

Bystander Video at 0:37-0:42, Dkt. No. 106-8.    Knepper acknowledged that he

appeared "aggressive" as he left his vehicle.    Knepper Depo. at 114:23-115:9, Dkt.

No. 106-10.    With his cell phone held at chest level, Knepper once more asked

Burger why he was being pulled over.    Knepper Depo. at 91:5-13, Dkt. No. 112-

11; Bystander Video at 0:41-0:42.    Burger attempted, but failed, to take away

Knepper's phone.    Bystander Video at 0:43-0:44.    While Knepper was asking

why he had been stopped, a different officer—who Plaintiffs identify as Vergara—

came behind Knepper and said, "I don't need a reason, I'll just make one up."

Lum-King Depo. at 77:18-78:2; *see* PCSF at ¶ 55.    With Knepper now holding his

cell phone in his hands above his waist, Burger again attempted to grab the phone

and, in doing so, made contact with Knepper's hands and arm.    Bystander Video

at 0:52-0:54.    Vergara then attempted to grab hold of Knepper's left arm, while

Burger held onto Knepper's shirt.    *Id*. at 0:58-1:00.    With Burger still holding his

shirt, Knepper put his right hand, which was still holding his cell phone, into the

driver's side window of the Jaguar.    *Id*. at 1:01.    One of the officers said, "how do

I know you're not reaching for a weapon[,]" to which Lum-King responded, "it's

9

not a weapon, it's not a weapon, it's his phone, it's his phone, it's not a weapon."
Lum-King Depo. at 57:1-10.   For the next roughly 30 seconds, Burger, Vergara,
and Knepper struggled outside of the Jaguar, with Knepper's right arm remaining
inside the vehicle.   Bystander Video at 1:01-1:31.   According to Lum-King,
Knepper was not trying to fight with Burger and Vergara.   Lum-King Depo. at
83:12-20.   At some point during these 30 seconds, Lum-King took Knepper's cell
phone from him.   *Id*. at 57:10-13.

After doing so, Lum-King exited the Jaguar on the passenger side, before
reaching back-in to retrieve two bags and two phones.   DCSF at ¶ 24; PCSF at ¶
24.   Juarez approached Lum-King, grabbed her arm, and asked her to get back into
the Jaguar.   Lum-King Depo. at 95:1-4.   Lum-King did not wish to return to the
Jaguar, prompting Juarez to instruct her to "get down on the ground."   *Id*. at 95:4-
8.   Lum-King again refused, stating that she had done nothing wrong.   *Id*. at 95:9-
11.   Juarez then reached into the Jaguar, turned off the ignition, and again asked
Lum-King to sit down.   *Id*. at 95:12-13, 100:16-21.   Lum-King did not want to sit
down and, instead, wanted to stand by a wall running parallel to the Highway.   *Id*.
at 101:1-4.   Juarez then grabbed Lum-King's possessions, causing the two to
engage in "a little bit of a tug of war" over the items.   *Id*. at 105:23-106:1.   On the
"final tug," Juarez pulled "hard" and "in the motion of him taking away [Lum-

10

King's] stuff, something whacked [her] in the mouth, which caused it to start bleeding." *Id*. at 105:2-8. Eventually, Juarez secured Lum-King's bag and moved Lum-King away from the road toward a wall adjacent to the sidewalk. DCSF at ¶ 31; PCSF at ¶ 31. Juarez did not ask Lum-King to turn over her belongings, and Lum-King did not hit or try to hit Juarez. Lum-King Depo. at 107:22-108:8; Depo. of Leonardo Juarez at 20:10-15, Dkt. No. 112-15.

Meanwhile, during Lum-King's encounter with Juarez, Burger, Vergara, and Knepper continued to interact. Burger first attempted unsuccessfully to pepper spray Knepper. Depo. of Michael Burger at 171:6-10, Dkt. No. 112-12. Burger next administered a "knee strike" to Knepper's left leg and deployed pepper spray in Knepper's eyes. *Id*. at 171:22-24, 172:16-19. At that time, Knepper was not using physical force against Burger or Vergara. *Id*. at 171:25-172:7. Burger then administered at least six more knee strikes to the area of Knepper's left upper leg or knee. Bystander Video at 2:00-2:07. Burger instructed Knepper to sit down, to which Knepper responded, "fuck you." Burger Depo. at 174:4-6. Burger acknowledged that "just" the words "fuck you" do not necessitate force. *Id*. at 174:7-11.

Roughly three minutes later, Apo arrived on scene.    Bystander Video at

5:26.[3]    As Apo tried to handcuff Knepper, Burger administered another knee

strike.    *Id*. at 5:32-5:45.    Vergara, followed by Burger, then attempted to remove

Knepper's left hand from inside the driver's side window of the Jaguar.    *Id*. at

5:45-6:07.    Knepper's right hand then appears to escape the hold of Apo, and Apo

drops the handcuffs to the ground.    *Id*. at 6:08-6:11.    With Burger holding

Knepper's left side and Vergara and Apo holding his right, the three officers then

tried to remove Knepper's hands from inside the Jaguar.    *Id*. at 6:12-6:16.    After a

few seconds of struggling, Vergara and Apo were successful in removing

Knepper's right hand.    *Id*. at 6:12-6:22.    As Knepper's right arm was being pulled

behind his back, Burger administered another knee strike to his left leg.    *Id*. at

6:22-6:26.    This was followed by four strikes to the back of Knepper's head.    *Id*.

at 6:27-6:31.    After striking Knepper's head, Burger placed him in a chokehold,

while Vergara and Apo attempted to bring Knepper to the ground.    *Id*. at 6:30-

6:43.    Knepper remained in Burger's chokehold until he was brought to the

---

[3]In the three-minute interim, Burger and Knepper largely engaged in conversation, at times
heated.    In addition, Burger and Vergara unsuccessfully attempted to pull Knepper away from
the Jaguar, Bystander Video at 2:46-2:52, after both of Knepper's hands entered the driver's side
window.    *Id*. at 2:26. As part of the unsuccessful attempt, Burger grabbed Knepper's left ear and
squeezed the back of Knepper's neck with his right hand, *id*. at 5:12-5:23.    It was not until just
before Apo's arrival that Vergara was able to remove Knepper's right arm from the Jaguar. *Id*.
at 5:22-5:25.

ground.  *Id*. at 6:30-6:44.   When Knepper went to the ground, Burger placed his right knee on Knepper's skull for roughly twelve seconds.   *Id*. at 6:45-6:57.   After rolling Knepper onto his front, Burger and Vergara attempted to bring Knepper's arms behind his back.   *Id*. at 6:57-7:10.   In doing so, Burger punched Knepper twice in the area of his upper right arm or elbow and once in the area of his neck or face.  *Id*. at 7:11-7:12.   About ten seconds later, Knepper was handcuffed.  *Id*. at 7:22.   In pulling Knepper up from the ground, Burger said that Knepper had bit his arm, to which Knepper responded, "no I didn't, you keep yelling that."  *Id*. at 7:37-7:41.   About 25 seconds later, while Knepper was sitting on the pavement next to the Jaguar, Burger pushed his fist in the back of Knepper's neck for several seconds.  *Id*. at 8:06-8:09.

Roughly 30 seconds later, Knepper was brought to his feet and taken to the sidewalk.  *Id*. at 8:36-8:50.   Burger then administered a knee strike to the area of Knepper's left hip or upper leg while Knepper was still handcuffed.  *Id*. at 8:50.   Around 20 seconds later, Burger administered another two knee strikes to the area of Knepper's left knee or upper leg.  *Id*. at 9:08-9:11.   Burger and Apo then brought Knepper to the ground adjacent to the sidewalk.  *Id*. at 9:11-9:13.   After Apo walked away, Burger kicked Knepper's left leg twice.  *Id*. at 9:24-9:42.   Burger then placed his knee on Knepper's left leg and tapped the back of

Knepper's head twice.   *Id*. at 9:43-9:51.   Burger then stood-up from kneeling on

Knepper, with no further force being employed.   *Id*. at 9:52-10:17.   During

Knepper's encounter with Burger, Knepper never tried to evade by flight.   Burger

Depo. at 48:7-8.

At some point, Knepper was arrested and taken to Castle Medical Center.

*See* Apo Decl. at ¶ 17.   The report from the Medical Center reflects that Knepper

presented with "multiple complaints of hand pain and wrist pain and shoulder

pain."   Undated Emergency Department Report of Adventist Health Castle, Dkt.

No. 112-18.   Knepper was provided with one dose of 1,000mg of acetaminophen.

After x-rays were performed, there was no evidence of "acute fracture or

dislocation" in Knepper's right shoulder and "no acute fracture, dislocation or

radiopaque foreign body" in his right wrist, with the x-rays described as

"unremarkable."   Knepper was discharged the same day, April 7, 2022.   *Id*.

During a traffic stop, an HPD officer should identify their rank and name,

provide a reason for the stop, and request the other individual's license,

registration, and proof of insurance.   Depo. of Brandon Fukuda at 62:14-63:18,

Dkt. No. 112-16.   Burger was trained to give a warning before using force, if

feasible.   Burger Depo. at 48:16-19.   Burger did not give any warning to Knepper

about using force.   *Id*. at 48:20-22.   Policies of the City prohibit neck restraints

14

and chokeholds unless "deadly force" is justified.    Fukuda Depo. at 6:8-17, 52:1-

3.    City policies allow the use of "deadly force" only if there is an "immediate

threat to someone's life…."    *Id*. at 43:23-44:2.    During the encounter with

Knepper, Vergara did not believe that "deadly force" was justified.    Vergara

Depo. at 34:3-5.    City policies require an officer witnessing an "unlawful use of

force" to immediately intervene, and then report the force to a supervisor.    Fukuda

Depo. at 55:23-56:14.    Vergara and Juarez did not intervene with respect to any

force used during the incident involving Knepper on April 7, 2022, and Vergara

did not report to a supervisor any force used as being unreasonable.    Vergara

Depo. at 27:1-10; Juarez Depo. at 42:22-24.    Burger was not disciplined and did

not receive training as a result of the April 7, 2022 incident.    Burger Depo. at

59:10-16.    Vergara also did not receive training after the incident.    Vergara Depo.

at 52:2-4.    HPD's "Professional Standards Office" does not automatically review

use of force incidents, and HPD did not conduct a "use-of-force investigation" of

the April 7, 2022 incident.    Depo. of Brandon Nakasato at 24:3-4, 39:15-21; *see*

PCSF at ¶¶ 117-118.

On March 3, 2023, the Defendants' attorney appeared for the first time in

this action.    Dkt. No. 16.    On April 3, 2023, Burger, along with the other

Defendants, filed an Answer to the Complaint.    Dkt. No. 18.    On May 26, 2023,

Burger emailed Florence Nakakuni, who appears to have been an attorney at the

City's Prosecutor's Office.   Email dated 5/26/23 from Michael Burger to Florence

Nakakuni, Dkt. No. 112-7 at 9; *see also* Email dated 6/27/23 from Florence

Nakakuni to Michael Burger, Dkt. No. 112-7 at 2 (appearing to state that Nakakuni

was the "misdemeanor prosecution division chief for the Prosecutor's Office).   In

his email, while observing that the Prosecutor's Office had taken "no action" with

respect to the incident on April 7, 2022 involving Knepper, Burger requested that

the Prosecutor's Office file charges against Knepper, stating that Knepper "is

currently suing me and 3 other officers for the incident."   Dkt. No. 112-7 at 9.

On June 19, 2023, Burger again emailed Nakakuni, asking for "misdemeanor

cases" against Knepper to be "re-file[d] and "set" for trial.   *Id*. at 5.   On June 23,

2023, the Prosecutor's Office filed a single-count criminal Complaint against

Knepper, alleging "[h]arassment" by way of a "strike, shove, kick, or…touch" of

Burger.   6/23/23 Complaint at 1, Dkt. No. 106-12.   On September 29, 2023, the

Complaint was dismissed without prejudice at the request of the Prosecutor's

Office after Nakakuni had "reviewed the records and files" of the case.   9/29/23

Order Granting Ex Parte Motion to Nolle Prosequi Without Prejudice, Dkt. No.

112-8 at 1; Decl. of Florence Nakakuni at ¶¶ 1-3, Dkt. No. 112-8 at 4.

## DISCUSSION

The Court addresses each of the claims alleged in the TAC in turn,

beginning with Claim One, which alleges Burger, Vergara, and Juarez violated the

First Amendment rights of Knepper and Lum-King.

## 1.    Claim 1

While the TAC is vague on the cause of the First Amendment violations

alleged in Claim One, *see* TAC at ¶¶ 42-48, the parties appear to agree in their

summary judgment briefing that this claim arises out of Plaintiffs' alleged inability

to use their cell phones to record some or all of the April 7, 2022 incident, *see* Dkt.

No. 105-1 at 9; Dkt. No. 111-1 at 10, 12.   So construed, Defendants first argue

that this claim cannot proceed because, although the public has a right to record

police officers engaged in their official duties in a public place, there is no such

right when the individual poses a threat to an officer's safety or there is probable

cause to arrest the individual.   Dkt. No. 105-1 at 10-14.   Defendants continue that

Burger had probable cause to arrest Knepper for disobeying a lawful order,

Knepper refused to move from the Highway, and Juarez was "concerned" about

Lum-King's possible access to weapons and involvement in the car break-in.

Defendants also argue that this claim should be dismissed at least as to Apo and

Vergara because they were not "integral" participants in any First Amendment

violation.   Finally, Defendants assert entitlement to qualified immunity because there is no "sufficiently similar" case establishing their conduct as violating the First Amendment.[4]

Like many of the claims discussed, but not dismissed, below, Defendants' principal arguments suffer from the same flaw: they do not construe the evidence in the light most favorable to Plaintiffs.   In fact, despite being aware of Plaintiffs' versions of events through their deposition testimony and despite having possession of at least two of the three videos depicting some (but, not all) of the incidents on April 7, 2022, Defendants largely ignore any version of events other than their own.   Such an approach, while perhaps saleable at trial, is not permissible for purposes of the instant motion.   Moreover, on many occasions, Defendants' versions of events ignore what can clearly be seen in the videos.

For example, Defendants argue that Burger had probable cause to arrest Knepper for disobeying a lawful order.   The evidence in the light most favorable to Plaintiffs shows something else, however.   Specifically, although Knepper concedes that Burger asked him to pull over off the Highway, according to

---

[4]With respect to Lum-King, Defendants do not challenge the underlying premise of her claim that she intended to engage in activity protected by the First Amendment.   Therefore, even though the Court is unaware of evidence presented indicating Lum-King intended to engage in any activity protected by the First Amendment, this potential issue is not further addressed herein.

Knepper, this order occurred only once, Burger refused to explain why Knepper

was being asked to pull over, and Burger even told Knepper that he could tow his

Jaguar SUV for "any reason."   In this light, it would not be hard for a jury to

believe that Burger's order was neither lawful nor being disobeyed.   Defendants

further argue that Knepper was essentially being disruptive and clogging a public

thoroughfare.   This ignores, however, the circumstances of Knepper's alleged

First Amendment activity.   Among other things, it occurred almost immediately

after he exited the Jaguar and in a thoroughfare that was already clogged due to no

fault of Knepper.   In addition, in conjunction with Knepper's testimony, a jury

could view the "bystander" video as depicting Burger attempting to bat away

Knepper's cell phone without providing any instruction for him to move, to turn

off or put away the phone, to use the phone elsewhere, or otherwise un-clog the

Highway.   As for Lum-King, Defendants argue that Juarez was concerned about

her access to weapons and involvement in the car break-in.   However, Lum-King

disputes that Juarez ever told her that she was being detained with respect to the

break-in or that Juarez told her to place her belongings on the ground.   Rather,

according to Lum-King, Juarez instructed her to sit on the ground without any

explanation, and, after she refused to do so, he grabbed her belongings resulting in

a "tug-of-war."   Once again, in this light, it would not be hard for a jury to believe

that law enforcement's orders to Lum-King were neither lawful nor being

disobeyed.

Defendants further argue that they are entitled to qualified immunity because

there is no "sufficiently similar" case to this one.[5]   Should Defendants' versions of

the events win-out, they very well may be right.   However, under Plaintiffs'

versions, including the videos when viewed in favor of Plaintiffs, the facts here fall

squarely within the precedent that Defendants acknowledge was established as of

April 2022--specifically, the precedent that members of the public have a right to

record police officers engaged in their duties in a public place.   *See Askins v. U.S.*

*Dep't of Homeland Sec.*, 899 F.3d 1035, 1044 (9th Cir. 2018).   Here, arguably,

Knepper and Lum-King—members of the public—exited the Jaguar to record

Burger, Juarez, and other police officers in or near the Highway—a public place—

and, instead of allowing this, Burger and Juarez attempted to take the recording

devices without any warning, explanation, or instruction other than saying that they

could "make one up."   Because clearly established law, including *Askins*, would

---

[5]Qualified immunity protects officials who do "not violate clearly established statutory or
constitutional rights of which a reasonable person would have known."   *Mullenix v. Luna*, 577
U.S. 7, 11 (2015) (quotation and internal quotation omitted).   "A clearly established right is one
that is sufficiently clear that every reasonable official would have understood that what he is
doing violates that right."   *Id*. (quotation omitted).   As an affirmative defense, Defendants have
the burden of pleading and proving qualified immunity.   *Frudden v. Pilling*, 877 F.3d 821, 831
(9th Cir. 2017).

have made it sufficiently clear that this conduct violated the First Amendment, qualified immunity is not warranted on the current record.

Defendants' remaining argument is that Plaintiffs' First Amendment claim should be dismissed as to Apo and Vergara because, unlike Burger and Juarez, they did not participate in the alleged improper conduct. As an initial matter, in the TAC, these claims are not alleged against *Apo*. Rather, they are asserted only against Burger, Juarez, and Vergara. *See* TAC at ¶¶ 42-48. Further, in their summary judgment response, Plaintiffs do not contend that Apo was in any way involved in the conduct relevant to the First Amendment claim. *See* Dkt. No. 111-1 at 9-13. Therefore, the Court does not construe Claim 1 as being asserted against Apo, and no such claim will be permitted going forward.

As for Vergara, Defendants argue that Vergara did not know Knepper was holding a cell phone, and he arrived after the initial confrontation between Burger and Knepper. The "bystander" video, however, can be construed otherwise. Notably, Vergara appeared with Burger and Knepper while Knepper was still holding his cell phone and, arguably, Vergara could be seen as attempting to reach for the phone, along with Burger, during the tussle with Knepper. As a result, construing the evidence in favor of Plaintiffs, the Court disagrees that Vergara

21

could not be found as participating in conduct that prevented Knepper from engaging in First Amendment activity.

## 2.    Claim 2

Claim 2 alleges that Knepper and Lum-King were detained and/or arrested and excessive force was used against them in violation of the Fourth and Fourteenth Amendments.   These claims are asserted against Burger, Vergara, Apo, and Juarez.   The Court addresses each distinct component in turn below.

### i.    Detention

Both Knepper and Lum-King allege that they were unconstitutionally detained.   Defendants argue that their detentions were permissible because of the car break-in at Sherwood's, the Jaguar was parked "near the scene of the crime", the Jaguar had been left running with shades blocking the windshield, the Jaguar was parked in a "dirt area" even though designated parking spaces were "nearly empty", the Jaguar was "hidden from view", the registration and safety check for the Jaguar were expired, and the Jaguar departed "quickly" after Apo arrived to investigate the break-in.   Dkt. No. 105-1 at 15-16, 19.

As an initial matter, both parties agree that the standard for whether Knepper or Lum-King was properly detained is whether a "reasonable suspicion" existed for doing so, which requires a "particularized and objective basis" to suspect a person

of criminal activity.   Dkt. No. 105-1 at 15 (citing *Terry v. Ohio*, 392 U.S. 1

(1968), and *C.L. v. Grossman*, 798 F. App'x 1015 (9th Cir. 2020)); Dkt. No. 111-1

at 13 (citing *Terry* and *Rodriguez v. United States*, 575 U.S. 348 (2015)).   Here,

many of the facts on which Defendants rely are either unsupported by the cited

evidence and/or disputed.

Notably, Defendants' place much stock on the circumstances surrounding

the car break-in.   The evidence reflects that Burger was told that an unknown male

had broken into a car at Sherwood's and that the unknown male suspect had been

with others in a gold-colored Toyota 4-Runner.   There is no evidence that the

male suspect looked like Knepper, that the dark-colored Jaguar that Knepper

operated looked like the gold-colored Toyota reported by Apo, or that a vehicle

other than or in addition to the Toyota was involved in the break-in.   As for Apo's

observations, his declaration does not support the idea that the Jaguar "quickly"

departed Sherwood's after his arrival.   There is also no evidence that the Jaguar

was parked "near" the scene of the crime, as opposed to simply being parked at

Sherwood's.   Further, it is disputed whether the Jaguar was secluded, hidden, or

otherwise suspiciously parked.   Knepper and Lum-King, for instance, both assert

that they were parked in the "middle" of the Sherwood's parking lot, not off in

some unobtrusive corner.   Essentially, therefore, the only undisputed and

supported facts are that the Jaguar's registration and safety check had expired, and the Jaguar was  running with shades covering the windshield while parked. Defendants do not suggest, though, that such bare facts rise to the level of reasonable suspicion of a crime.  Therefore, with the facts construed in the light most favorable to Plaintiffs, the Court does not find that Defendants are entitled to summary judgment with respect to Plaintiffs' detention claim.[6]

ii.  <u>Excessive Force</u>

Both Knepper and Lum-King allege that unconstitutionally excessive force was used against them during the incidents on April 7, 2022.  Starting with Knepper, Defendants argue that they used "reasonable" force because Burger initially only grabbed Knepper's wrist to "escort" him from the Highway, Knepper created an "immediate threat" to Burger and Vergara when he reached into the Jaguar, Knepper bit Burger, Knepper "resisted" after being informed of his arrest, and Knepper was a "person of interest" in a felony.  Dkt. No. 105-1 at 16-19.  As

---

[6]The Court notes that, in one sentence, Defendants also argue that Juarez should be entitled to qualified immunity even if his conduct was unreasonable in detaining or using force against Lum-King. Dkt. No. 105-1 at 19.  This meager effort to raise a qualified immunity defense, however, is not close to sufficient because, at the very least, the Court would need to provide the entirety of the argument needed to fuel any such defense that Defendants themselves do not offer.  The Court does not do that for litigants proceeding pro se and will not do it for the represented Defendants.  This includes, in their reply, Defendants' invocation of general legal principles as justification for their failure to properly raise or prove the defense.  *See* Dkt. No. 115 at 1.  Except for Claim 1, the Court does not consider Defendants to have properly raised or proven a qualified immunity defense that might warrant a further response.

for Lum-King, Defendants argue that the force used was "reasonable" because she had access to weapons, Juarez had "no way of knowing" if Lum-King's bag contained weapons or evidence of a crime, and Lum-King was a passenger in a vehicle that may have been involved in a felony. *Id*. at 19.

Once again, these explanations for the force used against Knepper and Lum-King view the events of April 7, 2022 only in the light most favorable to Defendants. When viewed correctly at summary judgment, however, the evidence does not support any of the explanations. Notably, they are all, at the very least, disputed. For example, a jury could find that the "bystander" video does not reflect Burger merely attempting to escort Knepper from the Highway. Instead, the video arguably shows Burger attempting to snatch and/or knock-down Knepper's cell phone. Further, although the same video shows Knepper reaching into the Jaguar, the evidence also reflects that Lum-King told Burger that Knepper was not reaching for a weapon and, fairly soon after reaching into the Jaguar, a jury could find that Knepper was not reaching for a weapon, particularly given that the hand in the vehicle appears clutched to the steering wheel. Put simply, at a point fairly soon after the purported "threat" began, a reasonable police officer would have known that the threat no longer existed. The evidence is also disputed as to whether Knepper bit Burger. Knepper now denies doing so, he denied doing

so contemporaneous with the event, and no objective evidence of such a bite has been offered.   There is also no evidence that Knepper was informed of his arrest and "resisted" thereafter.   Certainly, nothing in the various videos demonstrates such resistance.   It is also disputed whether Knepper was a "person of interest" in the car break-in at Sherwood's, for the reasons discussed above.   Turning to Lum-King, her "access" to weapons is disputed.   For instance, although Juarez contends that he was unsure whether Lum-King's bag contained weapons, this does not explain why, according to Lum-King, Juarez never asked her to put the bag down or relinquish it or otherwise warn her that Juarez was about to seize it.

In addition, Defendants' interpretations of the evidence do little to explain or justify the force Burger continued to use against Knepper throughout the prolonged interaction between them.   Among other things, Burger pepper-sprayed Knepper, administered numerous knee strikes, hit Knepper repeatedly near the head, placed Knepper in a chokehold, and punched him in the arm.   None of Defendants' explanations appear to justify these actions, particularly when there is no evidence of Knepper's resistance, the incident occurred in broad daylight in the middle of a busy highway, and Burger was supported at all relevant times by multiple law enforcement officers.   In that regard, the Supreme Court has explained that "all claims that law enforcement officers have used excessive force–deadly or not–in

26

the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should

be analyzed under the Fourth Amendment and its 'reasonableness' standard….."

*Graham v. Connor*, 490 U.S. 386, 395 (1989) (emphasis omitted).   This inquiry

necessitates "careful attention to the facts and circumstances of each particular

case, including the severity of the crime at issue, whether the suspect poses an

immediate threat to the safety of the officers or others, and whether he is actively

resisting arrest or attempting to evade arrest by flight."   *Graham*, 490 U.S. at 396.

Here, while many of the salient facts are disputed, in the light most favorable to

Plaintiffs, (1) there was arguably no crime at issue, at least none involving

Plaintiffs, (2) it is unclear whether Plaintiffs posed a threat to Defendants, but,

even if they did, the threat was over before the principal force was applied, and

(3) Plaintiffs did not attempt to "actively resist[]" arrest or flee.   In other words,

this is clearly not an excessive force claim to which Defendants are entitled

summary judgment.

   iii.   <u>Arrest</u>

     Knepper alleges that he was falsely arrested in violation of the Fourth

Amendment.   Defendants argue that there was probable cause to arrest Knepper

for disobeying a lawful police order, obstructing government operations, assault of

a law enforcement officer, harassment, and resisting arrest.   Dkt. No. 105-1 at 20.
For purposes of summary judgment, the Court disagrees with Defendants.

As an initial matter, both parties agree that the standard here is whether
"probable cause" existed to arrest Knepper, which requires a "probability or
substantial chance of criminal activity" or facts that would "lead a prudent person
to believe" a crime had been committed.   Dkt. No. 105-1 at 20; Dkt. No. 111-1 at
14.   Here, the facts viewed in the light most favorable to Plaintiffs do not support
probable cause existing for the crimes upon which Defendants rely.   First, as
discussed above, the facts are disputed both as to whether Knepper "disobeyed" an
order from Burger and even if any order was lawful.   Second, it is disputed
whether Knepper "intentionally" obstructed government operations on April 7,
2022, as Defendants acknowledge is required under Hawai'i law.   *See* Dkt. No.
105-1 at 17 n.2.   Third, the purported crimes of assault and harassment appear
premised upon Knepper biting Burger, but, as discussed both above and below,
even whether probable cause existed for such an act is a disputed issue.   Finally, it
is disputed whether Knepper "resisted" arrest for purposes of the Hawai'i law cited

by Defendants.[7]    Therefore, in light of the factual disputes at issue, Defendants are

not entitled to summary judgment with respect to this claim either.

### 3.    Claim 3

In Claim 3, Plaintiffs allege that the City violated their constitutional rights

pursuant to *Monell*.    The only remaining part of this claim, following the July 28,

2023 Order, Dkt. No. 54, concerns the City allegedly having an "unofficial

custom" of permitting its police officers to use unlawful or excessive force on non-

resisting members of the public, *see id*. at 9-11.    Defendants argue that this claim

should be dismissed because there is no evidence of such an unofficial custom.

Dkt. No. 105-1 at 24.    In response, Plaintiffs argue that, in this case, although

Defendants violated numerous police procedures, the City took no action against

them.    Dkt. No. 111-1 at 24.    Further, Plaintiffs cite three other examples of the

City "turning a blind eye" to its officers' unlawful force, as evidence of a "long

standing" unlawful custom under *Monell*.    *Id*. at 25.

Pursuant to *Monell*, a municipality can be liable for a custom that, although

not expressly enacted, is "so permanent and well settled[,]" it operates with the

---

[7]Specifically, the Hawaiʻi law, HRS Section 710-1026, requires a person to use or threaten
physical force or use "any other means creating a substantial risk" of bodily injury.    *See* Dkt.
No. 105-1 at 18 n.5.    Here, at the very least, it is disputed whether Knepper did any of these
things.

force of law.   436 U.S. at 691 (quotation omitted).   A "custom or practice can be

supported by evidence of repeated constitutional violations which went

uninvestigated and for which the errant municipal officers went unpunished."

*Hunter v. Cty. of Sacramento*, 652 F.3d 1225, 1236 (9th Cir. 2011).   However,

liability for a custom or practice cannot be based upon "isolated or sporadic

incidents; it must be founded upon practices of sufficient duration, frequency and

consistency that the conduct has become a traditional method of carrying out

policy."   *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996).

Here, at a minimum, Plaintiffs' *Monell* claim fails in terms of the "frequency

and consistency" of the alleged longstanding custom.   First, although Plaintiffs

contend that this case and three historical cases all concern law enforcement

officials who committed "excessive force" that went unpunished, Plaintiffs fail to

explain how the purported force in the past cases was "consisten[t]" or even

vaguely alike to the force used in this case.   Similarly, Plaintiffs fail to explain

how any of the other factors mentioned above that are relevant to the "excessive

force" inquiry, such as the severity of the crime at issue and the conduct (or lack

thereof) of the plaintiff, are consistent with the circumstances here.   Second, even

if the instant and historical cases cited could be considered, in some fashion,

consistent, *in toto*, they still amount to four cases over an *eight-year* period.   *See*

30

Dkt. No. 111-1 at 25 (stating that the past cases run from 2014 to 2020, while the

instant case occurred in 2022). In other words, one example of allegedly

unpunished "excessive force" every two years. These, at best, "sporadic" or

occasional incidents do not constitute a custom "so permanent and well settled"

that it operates with the force of law. *See Monell*, 436 U.S. at 691 (quotation

omitted); *Trevino*, 99 F.3d at 919 & n.3 (finding no genuine issue of material fact

where the alleged custom involved 5 incidents over roughly 11 years); *Meehan v.

Cty. of Los Angeles*, 856 F.3d 102, 107 (9th Cir. 1988) (finding two incidents

within three months did not establish an unofficial custom); *see also Kekona v.

City of San Diego*, 2024 WL 5227734, at *20-21 (S. D. Cal. Dec. 26, 2024)

(finding three prior incidents occurring within a two-year period to be "too few and

temporally scattered to allow a reasonable jury to find any pattern that could

sustain municipal liability.").[8] As a result, the City is entitled to summary

judgment with respect to this claim.

---

[8]Further, the Court notes that, to sustain an "unofficial custom" claim under *Monell*, a plaintiff
must show that the custom was the "moving force" behind a constitutional violation. *Monell*,
436 U.S. at 694. Here, Plaintiffs have presented no evidence (or argument) that the City's
alleged custom was the moving force behind any of the officers' conduct, which is, thus, another
reason for granting summary judgment to the City on this claim.

4.   **Claims 4 & 5**

In Claims 4 and 5, Plaintiffs rely on State tort law—specifically, negligence and battery—against Defendants, and vicarious liability, against the City, all arising out of the events on April 7, 2022.[9]   Defendants argue that these claims should be dismissed for two principal reasons.   Dkt. No. 105-1 at 21-24.   First, because Defendants acted reasonably on April 7, 2022, something which they contend means that they could not have acted negligently or committed battery. And second, because, as public officials, Burger, Vergara, Juarez, and Apo are entitled to a "qualified privilege", having acted without "malice."   In response, Plaintiffs argue that Defendants violated duties and HPD policies, used force against Plaintiffs without their consent, and used force consistent with "malice." Dkt. No. 111-1 at 21-23.

Upon review, the Court agrees in part and disagrees in part with both parties. First, as to Vergara, Juarez, and Apo, the Court agrees with Defendants that the "qualified privilege" defense applies.   Notably, in response, although Plaintiffs contend that *Burger's* conduct toward Knepper "evidences malice", no such

---

[9]The Court notes that, in the TAC, Claim 4 also alleges standalone claims of negligence against the City in its hiring, training, and supervision of employees.   TAC at ¶¶ 71-72.   Earlier in this case, however, the Court dismissed the claims of negligent hiring, training, and supervision, with leave to amend, Dkt. No. 54 at 15.   Plaintiffs did not timely amend that claim and, therefore, as explained in the June 25, 2024 Order, the claims remain dismissed.   Dkt. No. 99 at 5-6.

argument is made with respect to the conduct of Vergara, Juarez, or Apo, whether in the guise of malice or the "reckless disregard of the law" standard posited by Plaintiffs.   *See* Dkt. No. 111-1 at 23.   Therefore, in light of Plaintiffs' failure to counter Vergara, Juarez, and Apo's assertion of "qualified privilege", the Court finds those Defendants entitled to summary judgment on the claims of negligence and battery.

Second, as to Burger, the Court agrees with Plaintiffs that he is not entitled to summary judgment on these claims in light of the evidence in this case. Notably, while Defendants assert that Burger's use of force was "reasonable" "for the same reasons detailed" elsewhere in their motion for summary judgment, the Court has addressed those arguments above and found them wanting on this record.   Specifically, if anything is clear at this moment, it is that a jury should decide whether Burger's force against Knepper was reasonable.[10]   No rational person, after viewing at least the "bystander" video, could come to any other conclusion.   As for malice, while it is, of course, a closer call than whether Burger simply acted unreasonably, "[t]he existence or absence of malice is generally a

---

[10]The Court notes that, with respect to Claim 4, Plaintiffs "do not agree" that reasonableness is the correct barometer of whether Burger acted negligently.   Dkt. No. 111-1 at 21.   At this juncture, it is unnecessary for the Court to resolve this potential dispute—even if reasonableness was the correct standard, Burger would not be entitled to summary judgment.

question for the jury." *Beamer v. Nishiki*, 670 P.2d 1264, 1273 (Haw. 1983).

And, here, there is nothing in the record as a whole that would suggest the issue of

malice should not be placed before a jury, as opposed to decided as a matter of

law, with respect to Burger.   Therefore, the Court does not find Burger entitled to

summary judgment on Claims 4 or 5.[11]

## 5.    Claims 6 and 7

Claim 6 and Claim 7 allege, respectively, retaliation under the First

Amendment and malicious prosecution under the Fourth Amendment.   Both

claims are alleged by Knepper against Burger alone for Burger's alleged

involvement in the prosecution of Knepper for harassment after the filing of this

lawsuit.   Defendants argue that these claims should be dismissed because there

was probable cause to charge Knepper with harassment in addition to other

uncharged offenses.   Dkt. No. 105-1 at 20-21; Dkt. No. 115 at 2.[12]

The Court disagrees.   First, while Defendants contend that there was

probable cause for "numerous" charges, the record is clear that Knepper was

---

[11]The Court notes that, other than arguments specific to the individual officers, Defendants do
not make any independent argument that Claims 4 and 5, as they remain, should be dismissed as
to the City.   Therefore, the Court does not further address any such issue herein.
[12]While the Court agrees with Plaintiffs that, in their motion, Defendants raised this argument
solely as to Claim 7, Dkt. No. 105-1 at 20-21, because Defendants' argument concerning
probable cause applies equally to Claim 6 and Claim 7, the Court considers the argument as
sufficiently raised for purposes of both claims.

charged with one offense—harassment.   Therefore, it is entirely unclear, and unexplained, why the Court should consider whether there was probable cause to charge Knepper with offenses that were never brought.   As a result, the Court declines to do so.

Second, in light of the disputed facts in this case, the Court does not agree that sufficient evidence existed to charge Knepper with harassment, at least when the evidence is viewed in the light most favorable to Plaintiffs.   As an initial matter, despite asserting that probable cause existed for harassment, neither Defendants in their briefing nor the prosecuting attorney, Neil Osato, nor Osato's apparent supervisor, prosecuting attorney Nakakuni identify a *single* piece of evidence supporting the probable cause determination or a *single* reason for the charge.   Dkt. No. 105-1 at 20-21; Decl. of Neil Osato at ¶ 11, Dkt. No. 106-6.   It is, thus, not immediately obvious how the Court can evaluate the probable cause determination without the employment of guesswork.   It may be, though it is far from certain, that the charge was based on Knepper allegedly biting Burger during their encounter on April 7, 2022.   *See* Dkt. No. 105-1 at 17-18; Dkt. No. 106-12. This alleged act, though, is highly disputed, with Knepper denying the same and the video and photographic evidence being far from conclusive or even suggestive of a bite taking place.   At best, therefore, as *potential* evidence, this would leave

35

only Burger's own account that he was bitten by Knepper.    Burger alone, however, cannot supply the probable cause for a prosecuting decision.    *Cf.* *Hartman v. Moore*, 547 U.S. 250, 262 (2006) (explaining that a plaintiff must show that a non-prosecuting official, like Burger, "induced the prosecutor to bring charges that would not have been initiated without his urging.").    In short, with the basis for, and evidence supporting, the harassment charge unclear and, likely, disputed, the Court does not find that Burger is entitled to summary judgment with respect to Claims 6 and 7.

## CONCLUSION

To the extent set forth herein, the Court GRANTS IN PART and DENIES IN PART Defendants' Motion for Summary Judgment, Dkt. No. 105.

IT IS SO ORDERED.

DATED: February 28, 2025 at Honolulu, Hawai'i.



Derrick K. Watson
Chief United States District Judge

---

*Joshua Knepper and Leslie Lum-King vs. Michael Burger, et al*; Civ. No. 22-00556 DKW-WRP; **ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**